Michael WEBB, Donyell Beckwith, Willie Bradley, Mariano Cappelanmena, Timothy Collier, Steven Corbett, Rene Ellis, Leon Hardy, Tommy Jackson, Jr., Jeffrey McNeil, Brian Morgan, Jimmy Ramos, Shaka Reynolds, Eric Smith, Angel Valentine, James Walls, Edward Walsh, Sam Waters, Richard Weatherly, Harry Williams, Rodney Wright, Herbert Burgess, Manny Cabassa, Andres Chaparro Shawn Corwall, Gerald DeRosse, Michael McKenzie, Daniel Morales, Thomas Murphy, Cornelius Ricks, and George Simmons, Plaintiffs–Appellants,

v.

Glen S. GOORD, Individually and as Commissioner of the New York State Dept. of Correctional Services, Dr. Lester Wright, Individually and as Associate Commissioner for Health Services of the New York State Dept. of Correctional Services, Frank Headley, Individually and as Superintendent of the Arthur Kill Correctional Facility, Daniel Senkowski, Individually and as Superintendent of the Clinton Correctional Facility, Charles Greiner, Individually and as Superintendent of the Sing Sing Correctional Facility, Earl Couture, Individually and as Superintendent of the Governeur Correctional Facility, Michael McGinnes, Individually and as Superintendent of the Southport Correctional Facility, Edward Reynolds, Individually and as Superintendent of the Mohawk Correctional Facility, Robert Kuhlmann, Individually and as Superintendent of the Sullivan Correctional Facility, Melvin L. Hollins, Individually and as Superintendent of the Oneida Correctional Facility, Connelly, Mr., as Deputy Director of Security Sing Sing Correctional Facility, Gebber, Mr. as Correctional Counsel of Sing Sing Correctional Facility, Peter Lacy, Individually and as Superintendent of the Bare Hill Correctional Facility, Brian Malone, as Inspector General of the Docs, Berios, Sgt., Netti Condell, Correction Counselor, Joseph McCoy, Individually and as Superintendent of the Cayuga Correctional Facility, Huggins Sgt., Blankenship, Sgt., Daniel Crumb, Officer, Putnam, Officer, John Doe Kelly, Officer, Wein, Officer, Foster, Officer, Caldwell, Lt., Bishop, Sgt., Connelly, Deputy Superintendent, Sherman, Lt., Farrel, Lt., Vaughan, Sgt., Hood, Correction Officer, Charles Dufrain, Individually and as Superintendent of the Franklin Correctional Facility, Sweeney, Mr., as Deputy Superintendent of Security at the Governeur Correctional Facility, Rabsatt, Captain, Bourgal, Sgt., R. Nagle, Correction Officer, T. Link, Correction Officer, Defendants–Appellees.

Docket Nos. 02–0097(L), 02–0233.

United States Court of Appeals, Second Circuit.

Argued: March 6, 2003.

Decided: Aug. 13, 2003.

Paul E. Kerson, John F. Duane (of counsel), Koppell, Leavitt, Kerson, Leffler & Duane, New York, NY, for Plaintiffs–Appellants.

David Lawrence III, Assistant Solicitor General, Eliot Spitzer, Attorney General of the State of New York, and Michael Belohlavek, Deputy Solicitor General (of counsel), New York, NY, for Defendants–Appellees.

Before: POOLER, SACK, and B.D. PARKER, JR., Circuit Judges.

POOLER, Circuit Judge.

The original complaint in this action was filed on October 8, 1999, and an amended complaint was filed on January 14, 2000 before the defendants had responded to the original complaint. The district court dismissed the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), but granted the plaintiffs an opportunity to replead their allegations. *Webb v. Goord,* 197 F.R.D. 98 (S.D.N.Y. 2000). The plaintiffs filed a second amended complaint on October 27, 2000, but the district court again ruled that dismissal was warranted pursuant to Rule 12(b)(6). *Webb v. Goord,* 192 F.Supp.2d 208 (S.D.N.Y.2002). The plaintiffs appeal from this second dismissal.

## FACTS

The plaintiffs, with the exception of one who has been released, are inmates incarcerated in various correctional facilities administered by the New York State Department of Correctional Services ("DOCS"). The second amended complaint names an array of defendants: (1) the Commissioner of DOCS; (2) the Health Commissioner of DOCS; (3) the Inspector General of DOCS; (4) the Superintendents of fourteen separate correctional facilities administered by DOCS; (5) approximately fifty other DOCS employees, most of whom are corrections officers, and many of whom are identified only by their last name; and (6) one hundred "John Doe" defendants alleged to be DOCS corrections officers.

The second amended complaint alleges that each of the plaintiffs suffered a violation of his civil rights as a result of actions, or failures to act, on the part of DOCS officials and employees. Specifically, the second amended complaint alleges the occurrence of more than forty incidents that resulted in serious physical injury to the plaintiffs, including attacks by corrections officers, improper physical punishments, attacks by other inmates for which the defendants are responsible because of their failure to provide a safe prison environment, and denials of medical care to plaintiffs suffering from injury and illness.

Some features of these allegations stand out. First, the second amended complaint only sets forth the most basic facts of the incidents alleged to have resulted in injury. For the most part, each plaintiff is allotted one paragraph of the complaint, which provides the place and approximate time of the incident involving him, along with a sentence or two concerning the injury alleged to have arisen from the incident.

Further, the incidents are dispersed across time and space. That is, the events complained of are alleged to have taken place at fourteen separate DOCS facilities and, while most of the incidents are alleged to have taken place between 1997 and 1999, incidents occurring as long ago as 1990 are included in the second amended complaint. The plaintiffs' allegations therefore share a common nucleus of operative fact only in a very broad sense.

The second amended complaint asserts federal causes of action under the Eighth Amendment to the United States Constitution and under 42 U.S.C. Section 1983. It also asserts common law claims of assault, intentional infliction of emotional distress, *respondeat superior* liability, negligence, and "denial of medical treatment."

In spite of the brevity with which the plaintiffs' factual allegations are set forth, the second amended complaint constitutes a catalog of violence and ill treatment toward the plaintiffs. Numerous incidents resulting in, among other things, lacerations, serious bruises and fractures are alleged. For example, plaintiff Edward Walsh alleges that, after DOCS officials denied his request to be placed in protec-

tive custody, he was attacked so brutally by other inmates that he received facial wounds requiring sixty-eight stitches. Plaintiff Rodney Wright alleges that he required thirty-five stitches to close a wound received as a result of an attack by other inmates. Plaintiff Michael McKenzie alleges that an attack by corrections officers left him with seventeen broken bones in his face. It is neither trite nor patronizing for the Court to recognize the seriousness of such allegations.

After the first amended complaint was filed, the plaintiffs sought discovery as to matters going far beyond the specific events alleged therein. For example, the plaintiffs requested that the defendants produce "[a] list of the number of incidents in the past year where prisoners received 5 or more stitches" and "[a] list of the number and nature of complaints by prisoners against [DOCS] personnel for brutality and/or use of excessive force."

The second amended complaint specifically seeks relief only in the form of compensatory damages for each plaintiff. In correspondence with the district court, however, both before and after the dismissal of the second amended complaint, the plaintiffs' counsel asserted that much broader relief was appropriate. In a letter to the district court, dated April 3, 2000, the plaintiffs' counsel asserted that "an extraordinary event" had occurred in that *The New Yorker* magazine, in its issue of April 3, 2000, had published an article entitled "Guarding Sing Sing." The article, written by Ted Conover, a journalist who had taken a job as a corrections officer at a DOCS facility, describes several instances of brutality toward inmates.[1] None of these instances of brutality, however, involved any of the plaintiffs. Nevertheless, the plaintiffs' counsel asserted that the article "constitutes substantial admissions that tend to prove all of the allegations in this case and cry out for the appointment of a Special Master to govern the state prison system pursuant to the Prison Litigation Reform Act (PLRA), 18 U.S.C. Section 3626."

Further, after the second amended complaint was dismissed, the plaintiffs moved for reconsideration in light of the U.S. Supreme Court's decision in *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), which was issued on June 27, 2002. According to the plaintiffs' counsel, *Hope* not only established that summary judgment should be granted in favor of the plaintiffs, but also that "[a] Special Master should be appointed to run DOCS pursuant to the Prison Litigation Reform Act (PLRA), 18 U.S.C. Section 3626." The district court subsequently denied the motion for reconsideration.

## DISCUSSION

We review *de novo* a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Scutti Enters., LLC v. Park Place Entertainment Corp.*, 322 F.3d 211, 214 (2d Cir. 2003). Employing this standard, we affirm the district court.

### I. The General Inadequacy of the Second Amended Complaint.

In its opinion dismissing the first amended complaint, the district court expressed puzzlement that the instant action "although not so labeled, [is] akin to a class action challenging State prison conditions and operational practices." *Webb v. Goord*, 197 F.R.D. 98, 100 (S.D.N.Y.2000).

---

1. The article was excerpted from a highly acclaimed book. *See* Ted Conover, *Newjack: Guarding Sing Sing* (2000). The book won the National Book Critics Circle Award and was a finalist for the Pulitzer Prize.

In none of the three complaints that have been filed in this action do the plaintiffs actually assert class action claims pursuant to Federal Rule of Civil Procedure 23. This seems to us to be the most striking thing about this case. If anything, we have even more reason to be puzzled than was the district court because the bulk of the law upon which the plaintiffs rely on this appeal is class action law, and a good part of oral argument was devoted to the question of why this case was *not* brought as a class action. In sum, this case looks, walks, and sounds like a class action, but yet is not one.

■ We hasten to add that, because this case has not been brought as a class action, class action law is not dispositive as to our decision to affirm the district court. But we feel that some discussion of the class action law of this Circuit is highly useful to the explanation of our decision. For herein lies an explanation of the fundamental infirmity of the second amended complaint. Amalgamating more than forty discrete incidents of misconduct by DOCS officials does not make for a sustainable lawsuit. As the district court recognized, the claim of each individual plaintiff, standing alone, may or may not have merit. But, taken together, the claims do not establish the existence of a policy or practice existing throughout the DOCS system, or within a single DOCS facility, such that manageable discovery or a reasonable trial could be held in this action.

Our Circuit has expressed some trepidation regarding the efficacy of class action litigation in providing relief to individual inmate plaintiffs who claim that prison conditions, or the actions of prison officials, have violated their civil rights. In *Blyden v. Mancusi*, 186 F.3d 252 (2d Cir.1999), we considered the results of a district court's treatment of class action litigation arising from injuries allegedly suffered by inmates during the infamous 1971 disturbances at the Attica prison. The allegations specifically claimed that punishments meted out to inmates by prison officials and corrections officers once control of Attica had been regained after an inmate takeover of the facility violated the Eighth Amendment. Although we acknowledged the propriety of certifying a class of inmates when it was foreseeable that the parties might reach a settlement agreement, *id.*, at 269–70, we expressed skepticism that trials conducted by the district court could have adequately assessed the damages suffered by each member of the inmate class:

> We cannot claim to have the same familiarity with the record as the district court, but, even at a glance, the case bristles with individual issues. For example, the determination of what acts constituted "reprisals" involves consideration of a variety of conduct, including forcing the inmates to strip and lie on the ground, making them run through gauntlets, beatings during the gauntlets, singling out and beating the leaders, and more random acts of violence against individual prisoners. As to each, a trier [of fact] must determine what happened and ... its constitutional significance.

*Id.*, at 271. Still, district courts in our Circuit continue to properly recognize the utility of the class action device in suits challenging prison conditions when they believe that the requirements of Rule 23 have been met. *See, e.g., Ingles v. City of New York*, 2003 WL 402565 (S.D.N.Y. Feb.20, 2003) (certifying inmate class alleging use of excessive force in facilities operated by the New York City Department of Correction).

As already noted, however, the plaintiffs have not attempted to maintain a class action. If they had done so, it is likely that we would consider the concerns expressed in *Blyden* to be highly relevant.

While that case "bristle[d] with individual issues," the factual allegations pled in the second amended complaint present nothing but individual issues. While *Blyden* arose out of a single event—the Attica disturbances—the instant case arises from more than more than forty discrete acts of alleged misconduct encompassing a range of defendants so broad that their only substantial relation to one another is that they are all associated with DOCS. This case simply cannot be sustained as an action seeking to adjudicate claims and defenses arising from acts of misconduct which are only substantially related because they all are alleged to have occurred at DOCS facilities. The sheer diffuseness of the plaintiffs' allegations completely subverts their federal law claims.

## II. Eighth Amendment Claims.

■ The Eighth Amendment prohibits "cruel and unusual punishments." Again, it is possible that any of the individual incidents alleged by the plaintiffs may amount to a violation of the amendment in an action involving that incident alone. But proving this for any single incident would be extremely impractical in the context of a trial adjudicating claims arising from more than forty incidents. With respect to proving a violation of the Eighth Amendment by DOCS as a whole, the plaintiffs have not shown that more than forty unrelated incidents occurring over ten years at thirteen separate DOCS facilities can satisfy their burden of proving that "the conditions of [their] confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir.2002) (per curiam).

Specifically, the necessary foundation of a finding that a prison *system* has violated the Eighth Amendment is evidence of a concerted intent among prison officials, one expressed through discernable regula-

tions, policies or practices. It is by no means the case that federal courts have recently become indifferent to claims charging systemic violations of the Eighth Amendment by the concerted acts of prison officialdom. Nor is it the case that such claims are guaranteed a favorable hearing. *Compare Overton v. Bazzetta*, — U.S. ——, 123 S.Ct. 2162, 2170, 156 L.Ed.2d 162 (2003) (denying Eighth Amendment challenge to Michigan state prison policy of restricting visitation rights of prisoners who have violated regulations on substance abuse) *with Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (declaring Alabama state prison policy of shackling prisoners to hitching posts to be a violation of the Eighth Amendment).

But the cases just cited stand apart from the instant case in that *systemic* abuses were at issue, while this case involves a series of discrete incidents taking place within a single prison system over a long period of time. It is impossible for us to be more precise here without resorting to the vocabulary of metaphysics, but we hope we are not misunderstood when we assert that an accumulation of incidents— we do not say "a *mere* accumulation"— does not necessarily amount to a qualitative violation of the Eighth Amendment.

## III. Conspiracy to Violate Civil Rights.

■ The plaintiffs' claim under 42 U.S.C. § 1983, which is styled "Conspiracy to Violate Civil Rights," should actually be stated as a claim under Section 1985, which applies specifically to conspiracies. In order to maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Romer v. Morgenthau*, 119 F.Supp.2d 346, 363 (S.D.N.Y.2000) (ci-

tation omitted); *see also Warburton v. Underwood,* 2 F.Supp.2d 306, 319 (W.D.N.Y. 1998) (plaintiff stated claim of conspiracy to violate civil rights where prison officials allegedly conspired to force him to participate in drug treatment program that compromised his religious beliefs). The plaintiffs have not alleged, except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants. Their conspiracy allegation must therefore fail. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

## IV. Appointment of a Special Master.

■ The plaintiffs assert that, pursuant to the Prison Litigation Reform Act ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321–70 (1996), *codified at* 18 U.S.C. § 3626, a special master should be appointed to essentially administer DOCS in order to ensure its compliance with the Eighth Amendment. If one looks only at this country's history of prisoner rights litigation *before* the passage of the PLRA, this request is understandable. In a comprehensive assessment of this history, two political scientists have asserted that it amounts to "our nation's most aggressive campaign of judicial policy making." Malcolm M. Feeley and Edward L. Rubin, *Judicial Policy Making and the Modern State: How the Courts Reformed America's Prisons,* at 263 (1998). A primary means through which this campaign was effected was the appointment of special masters to oversee prison conditions. This was largely because "[t]he power to appoint a compliance coordinator, more familiarly known as a special master, is traditionally regarded as an inherent power of an equity court and is explicitly authorized by the Federal Rules of Civil Proce-

dure." *Id.* at 75 (citing Fed. R. Civ. Pro. 53(b)).

Whether or not the actions of the federal courts throughout this history was consistent with their proper role in our polity, and with the effective manifestation of the Eighth Amendments ideals, is the subject of much argument. But there is no argument over whether or not the PLRA represents a fundamental break with this history. The PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment. This may or may not be a good thing, but "Congress's ability to take action of this sort demonstrates that the courts are not nearly so imperial, or unstoppable, as their critics have claimed, even when grounding their authority on the Constitution." *Id.* at 383.

We hope it goes with saying that we cannot disregard the requirements set forth in the PLRA. That statute provides that a federal court may not grant any prospective relief at all—let alone appoint a special master to administer a state prison system—unless the court finds that "such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). The mere assertion that the appointment of a special master is appropriate obviously does not meet these strictures.

## V. Exhaustion of Administrative Remedies.

The PLRA further provides that a plaintiff may not bring a suit in federal court challenging prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It

is uncontested that none of the plaintiffs has alleged that he has exhausted available administrative remedies.

■ There was formerly some question as whether the PLRA's exhaustion requirement reached suits involving individual instances of prison misconduct, as opposed to prison conditions generally. In *Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12.(2002), however, the Supreme Court established that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." The plaintiffs attempt to escape the holding of *Porter* by contending that it should not be retroactively applied. ——— "When [the Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the] announcement of the rule." *Harper v. Virginia Dep't. of Taxation*, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). Our Circuit has already applied *Porter* retroactively, *see Lawrence v. Goord*, 304 F.3d 198, 200 (2d Cir.2002) (per curiam), and we see no reason to not do so here.

## VI. Hope v. Pelzer.

Finally, the plaintiffs' claim that *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), requires reversal here is baseless. In *Hope*, as we have already noted, the Supreme Court found that Alabama's practice of shackling prisoners to hitching posts as a disciplinary measure violates the Eighth Amendment. The case had nothing to do with the adequacy of

pleadings in an action challenging prison conditions.[2]

## CONCLUSION

Each incident alleged by the plaintiffs involves grave allegations of rights violations either perpetrated or tolerated by DOCS officials. In affirming the district court's dismissal of the second amended complaint, we take pains to assert that we are not establishing the triumph of form over substance. Rather, our affirmance should stand for the proposition that *form matters* in our system of adjudication. It matters because it is conducive to the coherent presentation of a plaintiff's claims, to the allowance of a fair opportunity to defendants to challenge those claims, and to the provision of appropriate relief. In sum, a proper attention to form is a prerequisite to the fair and efficient vindication of rights.

The judgment of the district court is AFFIRMED.

---

**2.** We also hold that the district court did not abuse its discretion in declining to exercise supplemental jurisdiction over the plaintiffs' state law claims. *See Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105–06 (2d Cir.1998).